CHANDLER ET AL. *v.* FLORIDA

No. 79–1260.   Argued November 12, 1980—Decided January 26, 1981

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed an opinion concurring in the result, *post*, p. 583. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 586. STEVENS, J., took no part in the decision of the case.

*Joel Hirschhorn* argued the cause and filed briefs for appellants.

*Jim Smith,* Attorney General of Florida, and *Calvin L. Fox,* Assistant Attorney General, argued the cause and filed a brief for appellee.*

---

*\*Whitney North Seymour* filed a brief for the American College of Trial Lawyers as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *J. Roger Wollenberg, Timothy B. Dyk, Floyd Abrams, Patricia Pickrel,* and *Ralph E. Goldberg* for CBS Inc.; by *Parker D. Thomson* and *Sanford L. Bohrer* for the Community Television Foundation of South Florida, Inc., et al.; by *Talbot D'Alemberte* and *Donald M. Middlebrooks* for Florida News Inter-

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented on this appeal is whether, consistent with constitutional guarantees, a state may provide for radio, television, and still photographic coverage of a criminal trial for public broadcast, notwithstanding the objection of the accused.

# I

## A

*Background.* Over the past 50 years, some criminal cases characterized as "sensational" have been subjected to extensive coverage by news media, sometimes seriously interfering with the conduct of the proceedings and creating a setting wholly inappropriate for the administration of justice. Judges, lawyers, and others soon became concerned, and in 1937, after study, the American Bar Association House of Delegates

---

ests on Development and Operation of Florida Rule; and by *J. Laurent Scharff, Joel M. Hamme, Jack N. Goodman, Mortimer Becker, Corydon B. Dunham, Erwin G. Krasnow, Carl R. Ramey, Arthur B. Sackler,* and *Ernest T. Sanchez* for the Radio Television News Directors Association et al.

Briefs of *amici curiae* were filed for the Attorney General of Alabama et al. by *Bronson C. La Follette,* Attorney General of Wisconsin, *Kirbie Knutson,* Assistant Attorney General, *Charles A. Graddick,* Attorney General of Alabama, *Wilson L. Condon,* Attorney General of Alaska, *Robert K. Corbin,* Attorney General of Arizona, *Thomas J. Miller,* Attorney General of Iowa, *Steven L. Beshear,* Attorney General of Kentucky, *William J. Guste, Jr.,* Attorney General of Louisiana, *Stephen H. Sachs,* Attorney General of Maryland, *Mike Greely,* Attorney General of Montana, *Richard H. Bryan,* Attorney General of Nevada, *Jeff Bingaman,* Attorney General of New Mexico, *Robert Abrams,* Attorney General of New York, *William J. Brown,* Attorney General of Ohio, *Dennis J. Roberts II,* Attorney General of Rhode Island, *William M. Leech, Jr.,* Attorney General of Tennessee, *M. Jerome Diamond,* Attorney General of Vermont, and *Chauncey H. Browning, Jr.,* Attorney General of West Virginia; for the Conference of Chief Justices by *Griffin B. Bell, James D. Miller,* and *James D. Whisenand;* and for the California State Public Defenders Association et al. by *Herbert M. Barish* and *Wilbur F. Littlefield.*

adopted Judicial Canon 35, declaring that all photographic and broadcast coverage of courtroom proceedings should be prohibited.[1] In 1952, the House of Delegates amended Canon 35 to proscribe television coverage as well. 77 A. B. A. Rep. 610–611 (1952). The Canon's proscription was reaffirmed in 1972 when the Code of Judicial Conduct replaced the Canons of Judicial Ethics and Canon 3A (7) superseded Canon 35. E. Thode, Reporter's Notes to Code of Judicial Conduct 56–59 (1973). Cf. Fed. Rule Crim. Proc. 53. A majority of the states, including Florida, adopted the substance of the ABA provision and its amendments. In Florida, the rule was embodied in Canon 3A (7) of the Florida Code of Judicial Conduct.[2]

In February 1978, the American Bar Association Committee on Fair Trial-Free Press proposed revised standards. These

---

[1] 62 A. B. A. Rep. 1134–1135 (1937). As adopted on September 30, 1937, Judicial Canon 35 read:

"Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the courtroom, during sessions of the court or recesses between sessions, and the broadcasting of court proceedings are calculated to detract from the essential dignity of the proceedings, degrade the court and create misconceptions with respect thereto in the mind of the public and should not be permitted."

[2] As originally adopted in Florida, Canon 3A (7) provided:

"A judge should prohibit broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions, except that a judge may authorize:

"(a) the use of electronic or photographic means for the presentation of evidence, for the perpetuation of a record, or for other purposes of judicial administration;

"(b) the broadcasting, televising, recording, or photographing of investitive, ceremonial, or naturalization proceedings;

"(c) the photographic or electronic recording and reproduction of appropriate court proceedings under the following conditions;

"(i) the means of recording will not distract participants or impair the dignity of the proceedings;

"(ii) the parties have consented, and the consent to being depicted or

included a provision permitting courtroom coverage by the electronic media under conditions to be established by local rule and under the control of the trial judge, but only if such coverage was carried out unobtrusively and without affecting the conduct of the trial.[3] The revision was endorsed by the ABA's Standing Committee on Standards for Criminal Justice and by its Committee on Criminal Justice and the Media, but it was rejected by the House of Delegates on February 12, 1979. 65 A. B. A. J. 304 (1979).

In 1978, based upon its own study of the matter, the Conference of State Chief Justices, by a vote of 44 to 1, approved a resolution to allow the highest court of each state to promulgate standards and guidelines regulating radio, television, and other photographic coverage of court proceedings.[4]

*The Florida Program.* In January 1975, while these developments were unfolding, the Post-Newsweek Stations of Florida petitioned the Supreme Court of Florida urging a change in Florida's Canon 3A (7). In April 1975, the court invited presentations in the nature of a rulemaking proceeding, and, in January 1976, announced an experimental program for televising one civil and one criminal trial under specific guidelines. *Petition of Post-Newsweek Stations, Florida, Inc.,* 327 So. 2d 1. These initial guidelines required the consent of all parties. It developed, however, that in practice such consent could not be obtained. The Florida Supreme Court then supplemented its order and established a new 1-year pilot pro-

recorded has been obtained from each witness appearing in the recording and reproduction;

"(iii) the reproduction will not be exhibited until after the proceeding has been concluded and all direct appeals have been exhausted; and

"(iv) the reproduction will be exhibited only for instructional purposes in educational institutions."

[3] Proposed Standard 8–3.6 (a) of the ABA Project on Standards for Criminal Justice, Fair Trial and Free Press (Tent. Draft 1978).

[4] Resolution I, Television, Radio, Photographic Coverage of Judicial Proceedings, adopted at the Thirtieth Annual Meeting of the Conference of Chief Justices, Burlington, Vt., Aug. 2, 1978.

gram during which the electronic media were permitted to cover all judicial proceedings in Florida without reference to the consent of participants, subject to detailed standards with respect to technology and the conduct of operators. *In re Petition of Post-Newsweek Stations, Florida, Inc.*, 347 So. 2d 402 (1977). The experiment began in July 1977 and continued through June 1978.

When the pilot program ended, the Florida Supreme Court received and reviewed briefs, reports, letters of comment, and studies. It conducted its own survey of attorneys, witnesses, jurors, and court personnel through the Office of the State Court Coordinator. A separate survey was taken of judges by the Florida Conference of Circuit Judges. The court also studied the experience of 6 States [5] that had, by 1979, adopted rules relating to electronic coverage of trials, as well as that of the 10 other States that, like Florida, were experimenting with such coverage.[6]

Following its review of this material, the Florida Supreme Court concluded "that on balance there [was] more to be gained than lost by permitting electronic media coverage of judicial proceedings subject to standards for such coverage." *In re Petition of Post-Newsweek Stations, Florida, Inc.*, 370 So. 2d 764, 780 (1979). The Florida court was of the view that because of the significant effect of the courts on the day-to-day lives of the citizenry, it was essential that the people have confidence in the process. It felt that broadcast cover-

[5] Alabama, Colorado, Georgia, New Hampshire, Texas, and Washington.

[6] The number of states permitting electronic coverage of judicial proceedings has grown larger since 1979. As of October 1980, 19 States permitted coverage of trial and appellate courts, 3 permitted coverage of trial courts only, 6 permitted appellate court coverage only, and the court systems of 12 other States were studying the issue. Brief for the Radio Television News Directors Association et al. as *Amici Curiae*. On November 10, 1980, the Maryland Court of Appeals authorized an 18-month experiment with broadcast coverage of both trial and appellate court proceedings. 49 U. S. L. W. 2335 (1980).

age of trials would contribute to wider public acceptance and understanding of decisions. *Ibid.* Consequently, after revising the 1977 guidelines to reflect its evaluation of the pilot program, the Florida Supreme Court promulgated a revised Canon 3A (7). *Id.,* at 781. The Canon provides:

> "Subject at all times to the authority of the presiding judge to (i) control the conduct of proceedings before the court, (ii) ensure decorum and prevent distractions, and (iii) ensure the fair administration of justice in the pending cause, electronic media and still photography coverage of public judicial proceedings in the appellate and trial courts of this state shall be allowed in accordance with standards of conduct and technology promulgated by the Supreme Court of Florida." *Ibid.*

The implementing guidelines specify in detail the kind of electronic equipment to be used and the manner of its use. *Id.,* at 778–779, 783–784. For example, no more than one television camera and only one camera technician are allowed. Existing recording systems used by court reporters are used by broadcasters for audio pickup. Where more than one broadcast news organization seeks to cover a trial, the media must pool coverage. No artificial lighting is allowed. The equipment is positioned in a fixed location, and it may not be moved during trial. Videotaping equipment must be remote from the courtroom. Film, videotape, and lenses may not be changed while the court is in session. No audio recording of conferences between lawyers, between parties and counsel, or at the bench is permitted. The judge has sole and plenary discretion to exclude coverage of certain witnesses, and the jury may not be filmed. The judge has discretionary power to forbid coverage whenever satisfied that coverage may have a deleterious effect on the paramount right of the defendant to a fair trial. The Florida Supreme Court has the right to revise these rules as experience dictates, or indeed to bar all broadcast coverage or photography in courtrooms.

## B

In July 1977, appellants were charged with conspiracy to commit burglary, grand larceny; and possession of burglary tools. The counts covered breaking and entering a well-known Miami Beach restaurant.

The details of the alleged criminal conduct are not relevant to the issue before us, but several aspects of the case distinguish it from a routine burglary. At the time of their arrest, appellants were Miami Beach policemen. The State's principal witness was John Sion, an amateur radio operator who, by sheer chance, had overheard and recorded conversations between the appellants over their police walkie-talkie radios during the burglary. Not surprisingly, these novel factors attracted the attention of the media.

By pretrial motion, counsel for the appellants sought to have experimental Canon 3A (7) declared unconstitutional on its face and as applied. The trial court denied relief but certified the issue to the Florida Supreme Court. However, the Supreme Court declined to rule on the question, on the ground that it was not directly relevant to the criminal charges against the appellants. *State* v. *Granger,* 352 So. 2d 175 (1977).

After several additional fruitless attempts by the appellants to prevent electronic coverage of the trial, the jury was selected. At *voir dire,* the appellants' counsel asked each prospective juror whether he or she would be able to be "fair and impartial" despite the presence of a television camera during some, or all, of the trial. Each juror selected responded that such coverage would not affect his or her consideration in any way. A television camera recorded the *voir dire.*

A defense motion to sequester the jury because of the television coverage was denied by the trial judge. However, the court instructed the jury not to watch or read anything about the case in the media and suggested that jurors "avoid the local news and watch only the national news on televi-

sion." App. 13. Subsequently, defense counsel requested that the witnesses be instructed not to watch any television accounts of testimony presented at trial. The trial court declined to give such an instruction, for "no witness' testimony was [being] reported or televised [on the evening news] in any way." *Id.*, at 14.

A television camera was in place for one entire afternoon, during which the State presented the testimony of Sion, its chief witness.[7] No camera was present for the presentation of any part of the case for the defense. The camera returned to cover closing arguments. Only 2 minutes and 55 seconds of the trial below were broadcast—and those depicted only the prosecution's side of the case.

The jury returned a guilty verdict on all counts. Appellants moved for a new trial, claiming that because of the television coverage, they had been denied a fair and impartial trial. No evidence of specific prejudice was tendered.

The Florida District Court of Appeal affirmed the convictions. It declined to discuss the facial validity of Canon 3A (7); it reasoned that the Florida Supreme Court, having decided to permit television coverage of criminal trials on an experimental basis, had implicitly determined that such coverage did not violate the Federal or State Constitutions. Nonetheless, the District Court of Appeal did agree to certify the question of the facial constitutionality of Canon 3A (7) to the Florida Supreme Court. The District Court of Appeal found no evidence in the trial record to indicate that the presence of a television camera had hampered appellants in presenting their case or had deprived them of an impartial jury.

The Florida Supreme Court denied review, holding that the appeal, which was limited to a challenge to Canon 3A (7),

---

[7] At one point during Sion's testimony, the judge interrupted the examination and admonished a cameraman to discontinue a movement that the judge apparently found distracting. App. 15. Otherwise, the prescribed procedures appear to have been followed, and no other untoward events occurred.

was moot by reason of its decision in *In re Petition of Post-Newsweek Stations, Florida, Inc.*, 370 So. 2d 764 (1979), rendered shortly after the decision of the District Court of Appeal.

## II

At the outset, it is important to note that in promulgating the revised Canon 3A (7), the Florida Supreme Court pointedly rejected any state or federal constitutional right of access on the part of photographers or the broadcast media to televise or electronically record and thereafter disseminate court proceedings. It carefully framed its holding as follows:

> "While we have concluded that the due process clause does not prohibit electronic media coverage of judicial proceedings per se, by the same token we reject the argument of the [Post-Newsweek stations] that the first and sixth amendments to the United States Constitution mandate entry of the electronic media into judicial proceedings." *Id.*, at 774.

The Florida court relied on our holding in *Nixon* v. *Warner Communications, Inc.*, 435 U. S. 589 (1978), where we said:

> "In the first place, . . . there is no constitutional right to have [live witness] testimony recorded and broadcast. Second, while the guarantee of a public trial, in the words of Mr. Justice Black, is 'a safeguard against any attempt to employ our courts as instruments of persecution,' it confers no special benefit on the press. Nor does the Sixth Amendment require that the trial—or any part of it—be broadcast live or on tape to the public. The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed." *Id.*, at 610 (citations omitted).

The Florida Supreme Court predicated the revised Canon 3A (7) upon its supervisory authority over the Florida courts,

and not upon any constitutional imperative. Hence, we have before us only the limited question of the Florida Supreme Court's authority to promulgate the Canon for the trial of cases in Florida courts.

This Court has no supervisory jurisdiction over state courts, and, in reviewing a state-court judgment, we are confined to evaluating it in relation to the Federal Constitution.

## III

Appellants rely chiefly on *Estes* v. *Texas,* 381 U. S. 532 (1965), and Chief Justice Warren's separate concurring opinion in that case. They argue that the televising of criminal trials is inherently a denial of due process, and they read *Estes* as announcing a *per se* constitutional rule to that effect.

Chief Justice Warren's concurring opinion, in which he was joined by Justices Douglas and Goldberg, indeed provides some support for the appellants' position:

> "While I join the Court's opinion and agree that the televising of criminal trials is inherently a denial of due process, I desire to express additional views on why this is so. In doing this, I wish to emphasize that our condemnation of televised criminal trials is not based on generalities or abstract fears. The record in this case presents a vivid illustration of the inherent prejudice of televised criminal trials and supports our conclusion that this is the appropriate time to make a definitive appraisal of television in the courtroom." *Id.,* at 552.

If appellants' reading of *Estes* were correct, we would be obliged to apply that holding and reverse the judgment under review.

The six separate opinions in *Estes* must be examined carefully to evaluate the claim that it represents a *per se* constitutional rule forbidding all electronic coverage. Chief Justice Warren and Justices Douglas and Goldberg joined Justice Clark's opinion announcing the judgment, thereby creating

only a plurality. Justice Harlan provided the fifth vote necessary in support of the judgment. In a separate opinion, he pointedly limited his concurrence:

> "I concur in the opinion of the Court, subject, however, to the reservations and only to the extent indicated in this opinion." *Id.*, at 587.

A careful analysis of Justice Harlan's opinion is therefore fundamental to an understanding of the ultimate holding of *Estes.*

Justice Harlan began by observing that the question of the constitutional permissibility of televised trials was one fraught with unusual difficulty:

> "Permitting television in the courtroom undeniably has mischievous potentialities for intruding upon the detached atmosphere which should always surround the judicial process. Forbidding this innovation, however, would doubtless impinge upon one of the valued attributes of our federalism by preventing the states from pursuing a novel course of procedural experimentation. My conclusion is that there is no constitutional requirement that television be allowed in the courtroom, *and, at least as to a notorious criminal trial such as this one, the considerations against allowing television in the courtroom so far outweigh the countervailing factors advanced in its support as to require a holding that what was done in this case infringed the fundamental right to a fair trial* assured by the Due Process Clause of the Fourteenth Amendment." *Ibid.* (emphasis added).

He then proceeded to catalog what he perceived as the inherent dangers of televised trials.

> "In the context of a trial of intense public interest, there is certainly a strong possibility that the timid or reluctant witness, for whom a court appearance even at its traditional best is a harrowing affair, will become more timid or reluctant when he finds that he will also be

appearing before a 'hidden audience' of unknown but large dimensions. There is certainly a strong possibility that the 'cocky' witness having a thirst for the limelight will become more 'cocky' under the influence of television. And who can say that the juror who is gratified by having been chosen for a front-line case, an ambitious prosecutor, a publicity-minded defense attorney, and even a conscientious judge will not stray, albeit unconsciously, from doing what 'comes naturally' into pluming themselves for a satisfactory television 'performance'?" *Id.,* at 591.

Justice Harlan faced squarely the reality that these possibilities carry "grave potentialities for distorting the integrity of the judicial process," and that, although such distortions may produce no telltale signs, "their effects may be far more pervasive and deleterious than the physical disruptions which all would concede would vitiate a conviction." *Id.,* at 592. The "countervailing factors" alluded to by Justice Harlan were, as here, the educational and informational value to the public.

JUSTICE STEWART, joined by JUSTICES Black, BRENNAN, and WHITE in dissent, concluded that no prejudice had been shown and that Estes' Fourteenth Amendment rights had not been violated. While expressing reservations not unlike those of Justice Harlan and those of Chief Justice Warren, the dissent expressed unwillingness to "escalate this personal view into a *per se* constitutional rule." *Id.,* at 601. The four dissenters disagreed both with the *per se* rule embodied in the plurality opinion of Justice Clark and with the judgment of the Court that "the *circumstances of* [*that*] trial led to a denial of [Estes'] Fourteenth Amendment rights." *Ibid.* (emphasis added).

Parsing the six opinions in *Estes,* one is left with a sense of doubt as to precisely how much of Justice Clark's opinion was joined in, and supported by, Justice Harlan. In an area

charged with constitutional nuances, perhaps more should not be expected. Nonetheless, it is fair to say that Justice Harlan viewed the holding as limited to the proposition that *"what was done in this case* infringed the fundamental right to a fair trial assured by the Due Process Clause of the Fourteenth Amendment," *id.,* 587 (emphasis added), he went on:

> *"At the present juncture* I can only conclude that televised trials, *at least in cases like this one,* possess such capabilities for interfering with the even course of the judicial process that they are constitutionally banned." *Id.,* at 596 (emphasis added).

Justice Harlan's opinion, upon which analysis of the constitutional holding of *Estes* turns, must be read as defining the scope of that holding; we conclude that *Estes* is not to be read as announcing a constitutional rule barring still photographic, radio, and television coverage in all cases and under all circumstances.[8] It does not stand as an absolute ban on

---

[8] Our subsequent cases have so read *Estes.* In *Sheppard* v. *Maxwell,* 384 U. S. 333, 352 (1966), the Court noted *Estes* as an instance where the "totality of circumstances" led to a denial of due process. In *Murphy* v. *Florida,* 421 U. S. 794, 798 (1975), we described it as "a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." And, in *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 552 (1976), we depicted *Estes* as a trial lacking in due process where "the volume of trial publicity, the judge's failure to control the proceedings, and the telecast of a hearing and of the trial itself" prevented a sober search for the truth.

In his opinion concurring in the result in the instant case, JUSTICE STEWART restates his dissenting view in *Estes* that the *Estes* Court announced a *per se* rule banning all broadcast coverage of trials as a denial of due process. This view overlooks the critical importance of Justice Harlan's opinion in relation to the ultimate holding of *Estes.* It is true that Justice Harlan's opinion "sounded a note" that is central to the proposition that broadcast coverage inherently violates the Due Process Clause. *Post,* at 585. But the presence of that "note" in no sense alters Justice Harlan's explicit reservations in his concurrence. Not all of the dissenting Justices in *Estes* read the Court as announcing a *per se*

state experimentation with an evolving technology, which, in terms of modes of mass communication, was in its relative infancy in 1964, and is, even now, in a state of continuing change.

## IV

Since we are satisfied that *Estes* did not announce a constitutional rule that all photographic or broadcast coverage of criminal trials is inherently a denial of due process, we turn to consideration, as a matter of first impression, of the appellants' suggestion that we now promulgate such a *per se* rule.

### A

Any criminal case that generates a great deal of publicity presents some risks that the publicity may compromise the right of the defendant to a fair trial. Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law. Over the years, courts have developed a range of curative devices to prevent publicity about a trial from infecting jury deliberations. See, *e. g., Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 563–565 (1976).

An absolute constitutional ban on broadcast coverage of

---

rule; JUSTICE BRENNAN, for example, was explicit in emphasizing "that only four of the five Justices [in the majority] rest[ed] on the proposition that televised criminal trials are constitutionally infirm, whatever the circumstances." 381 U. S., at 617. Today, JUSTICE STEWART concedes, *post,* at 585–586, and n. 3, that Justice Harlan purported to limit his conclusion to a subclass of cases. And, as he concluded his opinion, Justice Harlan took pains to emphasize his view that *"the day may come* when television will have become so commonplace an affair in the daily life of the average person as to dissipate *all* reasonable likelihood that its use in courtrooms *may* disparage the judicial process." 381 U. S., at 595 (emphasis added). That statement makes clear that there was not a Court holding of a *per se* rule in *Estes.* As noted in text, Justice Harlan pointedly limited his conclusion to cases like the one then before the Court, those "utterly corrupted" by press coverage. There is no need to "overrule" a "holding" never made by the Court.

trials cannot be justified simply because there is a danger that, in some cases, prejudicial broadcast accounts of pretrial and trial events may impair the ability of jurors to decide the issue of guilt or innocence uninfluenced by extraneous matter. The risk of juror prejudice in some cases does not justify an absolute ban on news coverage of trials by the printed media; so also the risk of such prejudice does not warrant an absolute constitutional ban on all broadcast coverage. A case attracts a high level of public attention because of its intrinsic interest to the public and the manner of reporting the event. The risk of juror prejudice is present in any publication of a trial, but the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly. See Part IV–D, *infra*.

## B

As we noted earlier, the concurring opinions in *Estes* expressed concern that the very presence of media cameras and recording devices at a trial inescapably gives rise to an adverse psychological impact on the participants in the trial. This kind of general psychological prejudice, allegedly present whenever there is broadcast coverage of a trial, is different from the more particularized problem of prejudicial impact discussed earlier. If it could be demonstrated that the mere presence of photographic and recording equipment and the knowledge that the event would be broadcast invariably and uniformly affected the conduct of participants so as to impair fundamental fairness, our task would be simple; prohibition of broadcast coverage of trials would be required.

In confronting the difficult and sensitive question of the potential psychological prejudice associated with broadcast coverage of trials, we have been aided by *amici* briefs submitted by various state officers involved in law enforcement, the Conference of Chief Justices, and the Attorneys General

of 17 States [9] in support of continuing experimentation such as that embarked upon by Florida, and by the American College of Trial Lawyers, and various members of the defense bar [10] representing essentially the views expressed by the concurring Justices in *Estes*.

Not unimportant to the position asserted by Florida and other states is the change in television technology since 1962, when Estes was tried. It is urged, and some empirical data are presented,[11] that many of the negative factors found in *Estes*—cumbersome equipment, cables, distracting lighting, numerous camera technicians—are less substantial factors today than they were at that time.

It is also significant that safeguards have been built into the

[9] Brief for the Attorneys General of Alabama, Alaska, Arizona, Iowa, Kentucky, Louisiana, Maryland, Montana, Nevada, New Mexico, New York, Ohio, Rhode Island, Tennessee, Vermont, West Virginia, and Wisconsin as *Amici Curiae*.

[10] Brief for the California State Public Defenders Association, the California Attorneys for Criminal Justice, the Office of the California State Public Defender, the Los Angeles County Public Defenders Association, the Los Angeles Criminal Courts Bar Association, and the Office of the Los Angeles County Public Defender as *Amici Curiae*.

[11] Considerable attention is devoted by the parties to experiments and surveys dealing with the impact of electronic coverage on the participants in a trial other than the defendant himself. The Florida pilot program itself was a type of study, and its results were collected in a postprogram survey of participants. While the data thus far assembled are cause for some optimism about the ability of states to minimize the problems that potentially inhere in electronic coverage of trials, even the Florida Supreme Court conceded the data were "limited," *In re Petition of Post-Newsweek Stations, Florida, Inc.*, 370 So. 2d 764, 781 (1979), and "non-scientific," *id.*, at 768. Still, it is noteworthy that the data now available do not support the proposition that, in every case and in all circumstances, electronic coverage creates a significant adverse effect upon the participants in trials—at least not one uniquely associated with electronic coverage as opposed to more traditional forms of coverage. Further research may change the picture. At the moment, however, there is no unimpeachable empirical support for the thesis that the presence of the electronic media, *ipso facto*, interferes with trial proceedings.

experimental programs in state courts, and into the Florida program, to avoid some of the most egregious problems envisioned by the six opinions in the *Estes* case. Florida admonishes its courts to take special pains to protect certain witnesses—for example, children, victims of sex crimes, some informants, and even the very timid witness or party—from the glare of publicity and the tensions of being "on camera." *In re Petition of Post-Newsweek Stations, Florida, Inc.*, 370 So. 2d, at 779.

The Florida guidelines place on trial judges positive obligations to be on guard to protect the fundamental right of the accused to a fair trial. The Florida Canon, being one of the few permitting broadcast coverage of criminal trials over the objection of the accused, raises problems not present in the rules of other states. Inherent in electronic coverage of a trial is the risk that the very awareness by the accused of the coverage and the contemplated broadcast may adversely affect the conduct of the participants and the fairness of the trial, yet leave no evidence of how the conduct or the trial's fairness was affected. Given this danger, it is significant that Florida requires that objections of the accused to coverage be heard and considered on the record by the trial court. See, *e. g., Green* v. *State*, 377 So. 2d 193, 201 (Fla. App. 1979). In addition to providing a record for appellate review, a pretrial hearing enables a defendant to advance the basis of his objection to broadcast coverage and allows the trial court to define the steps necessary to minimize or eliminate the risks of prejudice to the accused. Experiments such as the one presented here may well increase the number of appeals by adding a new basis for claims to reverse, but this is a risk Florida has chosen to take after preliminary experimentation. Here, the record does not indicate that appellants requested an evidentiary hearing to show adverse impact or injury. Nor does the record reveal anything more than generalized allegations of prejudice.

Nonetheless, it is clear that the general issue of the psychological impact of broadcast coverage upon the participants in a trial, and particularly upon the defendant, is still a subject of sharp debate—as the *amici* briefs of the American College of Trial Lawyers and others of the trial bar in opposition to Florida's experiment demonstrate. These *amici* state the view that the concerns expressed by the concurring opinions in *Estes,* see Part III, *supra,* have been borne out by actual experience. Comprehensive empirical data are still not available—at least on some aspects of the problem. For example, the *amici* brief of the Attorneys General concedes:

> "The defendant's interests in not being harassed and in being able to concentrate on the proceedings and confer effectively with his attorney are crucial aspects of a fair trial. There is not much data on defendant's reactions to televised trials available now, but what there is indicates that it is possible to regulate the media so that their presence does not weigh heavily on the defendant. *Particular attention should be paid to this area of concern as study of televised trials continues."* Brief for the Attorney General of Alabama et al. as *Amici Curiae* 40 (emphasis added).

The experimental status of electronic coverage of trials is also emphasized by the *amicus* brief of the Conference of Chief Justices:

> "Examination and reexamination, by state courts, of the in-court presence of the electronic news media, *vel non,* is an exercise of authority reserved to the states under our federalism." Brief for Conference of Chief Justices as *Amicus Curiae* 2.

Whatever may be the "mischievous potentialities [of broadcast coverage] for intruding upon the detached atmosphere which should always surround the judicial process," *Estes* v. *Texas,* 381 U. S., at 587, at present no one has been able to present empirical data sufficient to establish that the mere

presence of the broadcast media inherently has an adverse effect on that process. See n. 11, *supra*. The appellants have offered nothing to demonstrate that their trial was subtly tainted by broadcast coverage—let alone that all broadcast trials would be so tainted. See Part IV–D, *infra*.[12]

Where, as here, we cannot say that a denial of due process automatically results from activity authorized by a state, the admonition of Justice Brandeis, dissenting in *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932), is relevant:

> "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious, or unreasonable. . . . But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold." (Footnote omitted.)

---

[12] Other courts that have been asked to examine the impact of television coverage on the participants in particular trials have concluded that such coverage did not have an adverse impact on the trial participants sufficient to constitute a denial of due process. See, *e. g., Bradley* v. *Texas*, 470 F. 2d 785 (CA5 1972); *Bell* v. *Patterson*, 279 F. Supp. 760 (Colo.), aff'd, 402 F. 2d 394 (CA10 1968), cert. denied, 403 U. S. 955 (1971); *Gonzales* v. *People*, 165 Colo. 322, 438 P. 2d 686 (1968). On the other hand, even the *amici* supporting Florida's position concede that further experimentation is necessary to evaluate the potential psychological prejudice associated with broadcast coverage of trials. Further developments and more data are required before this issue can be finally resolved.

This concept of federalism, echoed by the states favoring Florida's experiment, must guide our decision.

## C

*Amici* members of the defense bar, see n. 10, *supra,* vigorously contend that displaying the accused on television is in itself a denial of due process. Brief for the California State Public Defenders Association et al. as *Amici Curiae* 5–10. This was a source of concern to Chief Justice Warren and Justice Harlan in *Estes:* that coverage of select cases "singles out certain defendants and subjects them to trials under prejudicial conditions not experienced by others." 381 U. S., at 565 (Warren, C. J., concurring). Selection of which trials, or parts of trials, to broadcast will inevitably be made not by judges but by the media, and will be governed by such factors as the nature of the crime and the status and position of the accused—or of the victim; the effect may be to titillate rather than to educate and inform. The unanswered question is whether electronic coverage will bring public humiliation upon the accused with such randomness that it will evoke due process concerns by being "unusual in the same way that being struck by lighting" is "unusual." *Furman* v. *Georgia,* 408 U. S. 238, 309 (1972) (STEWART, J., concurring). Societies and political systems, that, from time to time, have put on "Yankee Stadium" "show trials" tell more about the power of the state than about its concern for the decent administration of justice—with every citizen receiving the same kind of justice.

The concurring opinion of Chief Justice Warren joined by Justices Douglas and Goldberg in *Estes* can fairly be read as viewing the very broadcast of some trials as potentially a form of punishment in itself—a punishment before guilt. This concern is far from trivial. But, whether coverage of a few trials will, in practice, be the equivalent of a "Yankee Stadium" setting—which Justice Harlan likened to the public

pillory long abandoned as a barbaric perversion of decent justice—must also await the continuing experimentation.

## D

To say that the appellants have not demonstrated that broadcast coverage is inherently a denial of due process is not to say that the appellants were in fact accorded all of the protections of due process in their trial. As noted earlier, a defendant has the right on review to show that the media's coverage of his case—printed or broadcast—compromised the ability of the jury to judge him fairly. Alternatively, a defendant might show that broadcast coverage of his particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process. Neither showing was made in this case.

To demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters. *Murphy* v. *Florida,* 421 U. S. 794, 800 (1975). No doubt the very presence of a camera in the courtroom made the jurors aware that the trial was thought to be of sufficient interest to the public to warrant coverage. Jurors, forbidden to watch all broadcasts, would have had no way of knowing that only fleeting seconds of the proceeding would be reproduced. But the appellants have not attempted to show with any specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them or that their trial was affected adversely by the impact on any of the participants of the presence of cameras and the prospect of broadcast.

Although not essential to our holding, we note that at *voir dire,* the jurors were asked if the presence of the camera would in any way compromise their ability to consider the case. Each answered that the camera would not prevent him or her from considering the case solely on the merits. App.

8–12. The trial court instructed the jurors not to watch television accounts of the trial, *id.*, at 13–14, and the appellants do not contend that any juror violated this instruction. The appellants have offered no evidence that any participant in this case was affected by the presence of cameras. In short, there is no showing that the trial was compromised by television coverage, as was the case in *Estes.*

## V

It is not necessary either to ignore or to discount the potential danger to the fairness of a trial in a particular case in order to conclude that Florida may permit the electronic media to cover trials in its state courts. Dangers lurk in this, as in most experiments, but unless we were to conclude that television coverage under all conditions is prohibited by the Constitution, the states must be free to experiment. We are not empowered by the Constitution to oversee or harness state procedural experimentation; only when the state action infringes fundamental guarantees are we authorized to intervene. We must assume state courts will be alert to any factors that impair the fundamental rights of the accused.

The Florida program is inherently evolutional in nature; the initial project has provided guidance for the new canons which can be changed at will, and application of which is subject to control by the trial judge. The risk of prejudice to particular defendants is ever present and must be examined carefully as cases arise. Nothing of the "Roman circus" or "Yankee Stadium" atmosphere, as in *Estes,* prevailed here, however, nor have appellants attempted to show that the unsequestered jury was exposed to "sensational" coverage, in the sense of *Estes* or of *Sheppard* v. *Maxwell,* 384 U. S. 333 (1966). Absent a showing of prejudice of constitutional dimensions to these defendants, there is no reason for this Court either to endorse or to invalidate Florida's experiment.

In this setting, because this Court has no supervisory authority over state courts, our review is confined to whether

there is a constitutional violation. We hold that the Constitution does not prohibit a state from experimenting with the program authorized by revised Canon 3A (7).

*Affirmed.*

JUSTICE STEVENS took no part in the decision of this case.

JUSTICE STEWART, concurring in the result.

Although concurring in the judgment, I cannot join the opinion of the Court because I do not think the convictions in this case can be affirmed without overruling *Estes* v. *Texas,* 381 U. S. 532.

I believe now, as I believed in dissent then, that *Estes* announced a *per se* rule that the Fourteenth Amendment "prohibits all television cameras from a state courtroom whenever a criminal trial is in progress." *Id.,* at 614; see also *id.,* at 615 (WHITE, J., dissenting). Accordingly, rather than join what seems to me a wholly unsuccessful effort to distinguish that decision, I would now flatly overrule it.

While much was made in the various opinions in *Estes* of the technological improvements that might some day render television coverage of criminal trials less obtrusive, the restrictions on television in the *Estes* trial were not significantly different from those in the trial of these appellants. The opinion of the Court in *Estes* set out the limitations placed on cameras during that trial:

> "A booth had been constructed at the back of the courtroom which was painted to blend with the permanent structure of the room. It had an aperture to allow the lens of the cameras an unrestricted view of the courtroom. All television cameras and newsreel photographers were restricted to the area of the booth when shooting film or telecasting.
>
> "[L]ive telecasting was prohibited during a great portion of the actual trial. Only the opening and closing arguments of the State, the return of the jury's verdict

and its receipt by the trial judge were carried live with sound. Although the order allowed videotapes of the entire proceeding without sound, the cameras operated only intermittently, recording various portions of the trial for broadcast on regularly scheduled newscasts later in the day and evening. At the request of the petitioner, the trial judge prohibited coverage of any kind, still or television, of the defense counsel during their summations to the jury." *Id.,* at 537 (footnote omitted).

In his concurring opinion, Justice Harlan also remarked upon the physical setting:

"Some preliminary observations are in order: All would agree, I am sure, that at its worst, television is capable of distorting the trial process so as to deprive it of fundamental fairness. Cables, kleig lights, interviews with the principal participants, commentary on their performances, 'commercials' at frequent intervals, special wearing apparel and makeup for the trial participants—certainly such things would not conduce to the sound administration of justice by any acceptable standard. *But that is not the case before us. We must judge television as we find it in this trial—relatively unobtrusive, with the cameras contained in a booth at the back of the courtroom."* *Id.,* at 588 (emphasis added).

The constitutional violation perceived by the *Estes* Court did not, therefore, stem from physical disruption that might one day disappear with technological advances in television equipment. The violation inhered, rather, in the hypothesis that the mere presence of cameras and recording devices might have an effect on the trial participants prejudicial to the accused.[1] See *id.,* at 542–550 (opinion of the Court).

---

[1] Certain aspects of the *Estes* trial made that case an even easier one than this one in which to find no substantial threat to a fair trial. For example, the jurors in *Estes* were sequestered day and night, from the first day of the trial until it ended. The jurors in the present case were

And Justice Harlan sounded a note in his concurring opinion that is the central theme of the appellants here: "Courtroom television introduces into the conduct of a criminal trial the element of professional 'showmanship,' an extraneous influence whose subtle capacities for serious mischief in a case of this sort will not be underestimated by any lawyer experienced in the elusive imponderables of the trial arena." *Id.,* at 591.

It can accurately be asserted that television technology has advanced in the past 15 years, and that Americans are now much more familiar with that medium of communication. It does not follow, however, that the "subtle capacities for serious mischief" are today diminished, or that the "imponderables of the trial arena" are now less elusive.

The Court necessarily[2] relies on the concurring opinion of Justice Harlan in its attempt to distinguish this case from *Estes.* It begins by noting that Justice Harlan limited his opinion *"to a notorious criminal trial such as [the one in Estes] . . . ."* *Ante,* at 571 (emphasis of the Court). But the Court disregards Justice Harlan's concession that such a limitation may not be meaningful.[3] Justice Harlan admitted

---

not sequestered at all. Aside from a court-monitored opportunity for the jurors to watch election returns, the *Estes* jurors were not permitted to watch television at any time during the trial. In contrast, the jurors in the present case were left free to watch the evening news programs—and to look for a glimpse of themselves while watching replays of the prosecution's most critical evidence.

[2] The Court today concedes that Justice Clark's opinion for the Court in *Estes* announced a *per se* rule; that the concurring opinion of Chief Justice Warren, joined by Justices Douglas and Goldberg, pointed to "the inherent prejudice of televised criminal trials"; and that the dissenting Justices objected to the announcement of a *per se* rule, *ante,* at 570, 572.

[3] The Court also seems to disregard its own description of the trial of the appellants, a description that suggests that the trial was a "notorious" one, at least in the local community. The Court's description notes that "several aspects of the case distinguish it from a routine burglary . . . [and] [n]ot surprisingly, these novel factors attracted the attention of the

that "it may appear that no workable distinction can be drawn based on the type of case involved, or that the possibilities for prejudice [in a 'run-of-the-mill' case], though less severe, are nonetheless of constitutional proportions." 381 U. S., at 590. Finally, Justice Harlan stated unambiguously that he was "by no means prepared to say that the constitutional issue should ultimately turn upon the nature of the particular case involved." *Ibid.*[4]

The Court in *Estes* found the admittedly unobtrusive presence of television cameras in a criminal trial to be inherently prejudicial, and thus violative of due process of law. Today the Court reaches precisely the opposite conclusion. I have no great trouble in agreeing with the Court today, but I would acknowledge our square departure from precedent.

JUSTICE WHITE, concurring in the judgment.

The Florida rule, which permits the televising of criminal trials under controlled conditions, is challenged here on its face and as applied. Appellants contend that the rule is facially invalid because the televising of *any* criminal trial over the objection of the defendant inherently results in a constitutionally unfair trial; they contend that the rule is unconstitutional as applied to them because their case attracted substantial publicity and, therefore, falls within the rule established in *Estes* v. *Texas,* 381 U. S. 532 (1965).[*] The Florida court rejected both of these claims.

---

media." *Ante,* at 567. Indeed, the Court's account confirms the wisdom of Justice Harlan's concession that a *per se* rule limited only to cases with high public interest may not be workable.

[4] The fact is, of course, that a run-of-the-mill trial—of a civil suit to quiet title, or upon a "routine burglary" charge for example—would hardly attract the cameras of public television. By the same token, the very televising of a trial serves to make that trial a "notorious" or "heavily publicized" one.

[*] In their motion in the Florida Circuit Court to declare Florida's rule unconstitutional, appellants claimed that their case had "received a sub-

For the reasons stated by JUSTICE STEWART in his concurrence today, I think *Estes* is fairly read as establishing a *per se* constitutional rule against televising any criminal trial if the defendant objects. So understood, *Estes* must be overruled to affirm the judgment below.

It is arguable, however, that *Estes* should be read more narrowly, in light of Justice Harlan's concurring opinion, as forbidding the televising of only widely publicized and sensational criminal trials. Justice Harlan, the fifth vote in *Estes,* characterized *Estes* as such a case and concurred in the opinion of the Court only to the extent that it applied to a "criminal trial of great notoriety." *Id.,* at 587. He recognized that there had been no showing of specific prejudice to the defense, *id.,* at 591, but argued that no such showing was required "in cases like this one."

Whether the decision in *Estes* is read broadly or narrowly, I agree with JUSTICE STEWART that it should be overruled. I was in dissent in that case, and I remain unwilling to assume or conclude without more proof than has been marshaled to date that televising criminal trials is inherently prejudicial even when carried out under properly controlled conditions. A defendant should, of course, have ample opportunity to convince a judge that televising his trial would be unfair to him, and the judge should have the authority to exclude cameras from all or part of the criminal trial. But absent some showing of prejudice to the defense, I remain convinced that a conviction obtained in a state court should not be overturned simply because a trial judge refused to exclude television cameras and all or part of the trial was

---

stantial amount of publicity" and then argued that "[a]s . . . in *Estes* v. *Texas,* 381 U. S. 532 (1965), the presence of television cameras . . . will substantially harm and impair the Defendant's right to a fair and impartial trial . . . ." App. 4. In their brief on the merits, appellants described their case as "not 'notorious' [but] at least 'more than routine' " and asked the Court to extend the *Estes* rule to it. Brief for Appellants 10.

televised to the public. The experience of those States which have, since *Estes,* permitted televised trials supports this position, and I believe that the accumulated experience of those States has further undermined the assumptions on which the majority rested its judgment in *Estes.*

Although the Court's opinion today contends that it is consistent with *Estes,* I believe that it effectively eviscerates *Estes.* The Florida rule has no exception for the sensational or widely publicized case. Absent a showing of specific prejudice, *any* kind of case may be televised as long as the rule is otherwise complied with. *In re Petition of Post-Newsweek Stations, Florida, Inc.,* 370 So. 2d 764, 774 (Fla. 1979). Thus, even if the present case is precisely the kind of case referred to in Justice Harlan's concurrence in *Estes,* the Florida rule overrides the defendant's objections. The majority opinion does not find it necessary to deal with appellants' contention that because their case attracted substantial publicity, specific prejudice need not be shown. By affirming the judgment below, which sustained the rule, the majority indicates that not even the narrower reading of *Estes* will any longer be authoritative.

Moreover, the Court now reads *Estes* as merely announcing that on the facts of that case there had been an unfair trial—*i. e.,* it established no *per se* rule at all. Justice Clark's plurality opinion, however, expressly recognized that no "isolatable" or "actual" prejudice had been or need be shown, 381 U. S., at 542–543, and Justice Harlan expressly rejected the necessity of showing "specific" prejudice in cases "like this one." *Id.,* at 593. It is thus with telling effect that the Court now rules that "[a]bsent a showing of prejudice of constitutional dimensions to these defendants," there is no reason to overturn the Florida rule, to reverse the judgment of the Florida Supreme Court, or to set aside the conviction of the appellants. *Ante,* at 582.

By reducing *Estes* to an admonition to proceed with some caution, the majority does not underestimate or minimize the

risks of televising criminal trials over a defendant's objections. I agree that those risks are real and should not be permitted to develop into the reality of an unfair trial. Nor does the decision today, as I understand it, suggest that any State is any less free than it was to avoid this hazard by not permitting a trial to be televised over the objection of the defendant or by forbidding cameras in its courtrooms in any criminal case.

Accordingly, I concur in the judgment.