UNITED STATES of America,

v.

Zacarias MOUSSAOUI a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," Defendant.

No. CR.NO. 01–455–A.

United States District Court, E.D. Virginia, Alexandria Division.

Jan. 18, 2002.

Frank W. Dunham, Jr., Office of the Federal Public Defender, Alexandria, VA, Edward B. MacMahon, Middleburg, VA, Gerald Thomas Zerkin, Office of the Public Defender, Richmond, VA, for defendant.

Robert A. Spencer, U.S. Attorney's Office, Alexandria, VA, for U.S.

### MEMORANDUM OPINION

BRINKEMA, District Judge.

Before this Court is the motion of intervenor, Courtroom Television Network, LLC ("Court TV"), to Record and Telecast the Pretrial and Trial Proceedings ("Motion to Record and Telecast") in this criminal case.[1] Stressing the extraordinary national and international public interest in this prosecution, which involves allegations that the defendant was a member of the al Qaeda conspiracy to blow up the World Trade Center in Manhattan and government buildings in the Washington, D.C. area, intervenors ask this Court to ignore or declare unconstitutional the well-established ban on photographing and broadcasting federal criminal pretrial and trial proceedings.

The United States vigorously opposes the intervenors' constitutional challenge to the ban and raises compelling objections to the photographing and broadcasting of these proceedings in any format. Defendant's position is ambivalent. He opposes any broadcast of pretrial proceedings out of concern that it might taint the potential jury pool; and he opposes any televised replay of the trial if the jury is not sequestered. If the jury is sequestered, he supports the intervenors' motion.

For the reasons that follow, we find that the Court has no discretion to disregard the present ban on the photographing and broadcasting of federal criminal proceedings. We also find this ban does not violate the constitutional rights of either the public or the broadcast media. Moreover, even if the mandatory ban were declared unconstitutional, given the issues raised in the indictment, any societal benefits from photographing and broadcasting these proceedings are heavily outweighed by the significant dangers world wide broadcasting of this trial would pose to the orderly and secure administration of justice.

### I. Federal Rule of Criminal Procedure 53

Federal Rule of Criminal Procedure 53 ("Rule 53"),[2] entitled "Regulation of Conduct in the Courtroom," provides that

> "[t]he taking of photographs in the court room during the progress of judicial proceedings or radio broadcasting of judicial proceedings from the court room shall not be permitted by the court."

■ The words "shall not be permitted" make clear that this rule is mandatory, leaving the Court with no discretion to ignore the categorical ban. *See United States v. Kerley,* 753 F.2d 617, 619–20 (7th Cir.1985). Nor can Rule 53 be rewritten or finessed through technical hairsplitting. *See United States v. Hastings,* 695 F.2d 1278, 1280 (11th Cir.1983) (extending the right of access to include the right of the media to televise, record and broadcast criminal trials is a misconstruction of Supreme Court precedent).

Recognizing the mandatory nature of Rule 53, intervenors attempt to avoid this *per se* ban on photographing and broadcasting fed-

---

1. C–SPAN Networks have also intervened for the limited purpose of obtaining leave to record and telecast these proceedings. C–SPAN adopted the substantive arguments made by Court TV.

Amici Curiae, Radio–Television News Directors Association, Cable News Network LP, LLLP, The Reporters Committee for Freedom of the Press, American Broadcasting Cos., Inc., National Broadcasting Company, Inc., CBS Broadcasting, Inc., and National Narrowcast Network, L.P., have filed memoranda in support of Court TV's Motion to Record and Telecast.

2. Local Rule 83.3(a), entitled "Photographing, Broadcasting and Televising in Courtroom and Environs," provides that

"[t]he taking of photographs and operation of tape recorders in the Courtroom or its environs, and radio or television broadcasting from the Courtroom or its environs during the progress or in connection with judicial proceedings... is prohibited..."

Because local rules must be consistent with existing Acts of Congress and federal rules of practice and procedure, 28 U.S.C. § 2071(a), a discussion of the constitutionality of Rule 53 necessarily includes an examination of Local Rule 83.3.

eral criminal proceedings by arguing that the rule is unconstitutional. There is no case law that directly supports that argument. Other than through the rule making process, the Supreme Court has not had an occasion to consider the constitutionality of Rule 53. However, the Fifth, Sixth, Seventh and Eleventh Circuits have found Rule 53 to be constitutional, concluding that the First Amendment does not include a right to televise, record or otherwise broadcast federal criminal trial proceedings. *See Conway v. United States,* 852 F.2d 187, 188 (6th Cir.1988); *United States v. Edwards,* 785 F.2d 1293, 1295–96 (5th Cir.1986); *Kerley,* 753 F.2d at 622; *Hastings,* 695 F.2d at 1280.

■ Lacking any authority to support their position directly, intervenors rely on a line of Supreme Court jurisprudence addressing the First Amendment guarantee to the public of a right of access to criminal trials. This right was first articulated in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), a case involving the fourth retrial of a defendant for murder. Finding that public observers in the courtroom might distract the jury, the trial court granted the defendant's motion to close the proceedings and banished all spectators, including two reporters, from the courtroom. Although without a majority opinion, the Supreme Court reversed that decision by a 7–1 vote. The majority of the justices acknowledged, albeit for different reasons, that the First Amendment does guarantee to the public a right of access to criminal trials. *Id.* at 580, 100 S.Ct. 2814.

Intervenors argue that where limited seating in a courthouse cannot accommodate all those who want to observe a trial, the right of access of those persons unable to attend is violated. Only through photographing and broadcasting such trials can the public's right of access be vindicated. Confronted with a similar argument involving a civil trial, the Second Circuit in *Westmoreland v. Columbia Broadcasting System, Inc.,* 752 F.2d 16 (2nd Cir.1984), a case the court described as a "paradigm case for televising," held that "there is a long leap, however, between a public right under the First Amendment to attend trials and a public right under the First Amendment to see a given trial televised. It is a leap not supported by history." *Id.* at 23. We agree with that conclusion.

■ The public's right of access is constitutionally satisfied when some members of both the public and the media are able to "attend the trial and report what they have observed." *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 610, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). These constitutional requirements are fully met by the way the Moussaoui proceedings are being conducted. An audio-visual feed of the proceedings to a nearby courtroom has increased seating capacity to 200 seats, about one half of which are reserved for the media and the other half for the general public. Daily transcripts will be electronically available within three hours of the close of each day's court session, as was done in *United States v. McVeigh,* No. 96–CR–68–M (W.D.Okla.). These arrangements fully satisfy the constitutional requirements for openness and accessibility. Moreover, the immediate availability of the transcripts will avoid the concerns expressed by the intervenors about minimizing inaccurate reporting.

Intervenors also contend that the *per se* ban on photographing and broadcasting from federal criminal courtrooms discriminates against the electronic media. They liken the television camera to a sketch artist's drawing pad or a print reporter's pen and paper and argue that excluding cameras and recording devices from the courtroom unlawfully deprives them of the "tools of their trade". However, these various forms of media are only distinguished by the manner in which the information is delivered, conveyed and packaged to the public, not the methods by which the news is gathered. Electronic media representatives are not excluded from the courtroom, nor are they treated differently than members of the print media. As a reasonable "manner" restriction on access to public proceedings, Rule 53 limits only the equipment members of the media are permitted to bring into the courtroom. *See Conway,* 852 F.2d at 188; *Kerley,* 753 F.2d at 620–21; *Hastings,* 695 F.2d at 1282–84. Nothing in Rule 53 prevents members of

electronic media from attending the trial, taking notes while seated in the gallery and reporting about it. Members of the print media are similarly deprived of the tools of their trade, including lap top computers, cell phones, hand-held organizers and other electronic devices. The First Amendment "does not embody an independent right to bring the mechanical facilities of the broadcasting or printing industries into the courtroom." *Estes v. Texas*, 381 U.S. 532, 589, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring).

Contrary to what intervenors and amici have argued, the inability of every interested person to attend the trial in person or observe it through the surrogate of the media does not raise a question of constitutional proportion. Rather, this is a question of social and political policy best left to the United States Congress and the Judicial Conference of the United States. For these reasons, we find no constitutional defect in Rule 53 or Local Rule 83.3.

## II. Appropriateness of Broadcasting this Particular Trial

■ Even if Rule 53 and Local Rule 83.3 were found unconstitutional, this Court would deny the intervenors' motion. The right of access is not absolute. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Westmoreland*, 752 F.2d at 19. It may be tempered by a defendant's right to a fair trial, *see Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 14–15, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), the need to preserve the secrecy of Grand Jury proceedings, *see Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), or concerns about witness security, *see Globe Newspaper Co.*, 457 U.S. at 608–09, 102 S.Ct. 2613. Limitations on access may be necessary to "preserve higher values." *Press–Enterprise Co.*, 478 U.S. at 9, 106 S.Ct. 2735.

■ Significant concerns about the security of trial participants and the integrity of the fact finding process justify a ban on photographing and broadcasting this trial. In particular, we find that audio or visual broadcasting of any portion of these proceedings is likely to intimidate witnesses and jurors, as well as threaten the security of the courtroom and all those involved in this trial.

Intervenors contend that televising this trial will enhance its truth seeking aspects. They argue that allowing the public to participate through the lens of the television camera will serve as a check on the judicial process. However, "it is impossible to believe that the reliability of a trial as a method of finding facts and determining guilt or innocence increases in relation to the size of the crowd watching it." *Estes*, 381 U.S. at 595, 85 S.Ct. 1628 (Harlan, J., concurring). The presence of interested spectators, attorneys, jurors and a judge will satisfy the safeguards of a public trial and ensure the integrity of these proceedings. *See id.; see also Globe Newspaper Co.*, 457 U.S. at 606, 102 S.Ct. 2613.

Intervenors stress that the state of audio-visual technology has reached such a degree of miniaturization and efficiency as to avoid the tangle of wires and obtrusiveness of cameras, microphones and lighting which led the Supreme Court to hold that televising the trial so interfered with the orderly process of justice that it violated the defendant's rights to due process and his Sixth Amendment right to a fair trial. *See Estes*, 381 U.S. at 550–51, 85 S.Ct. 1628.[3] We agree with the intervenors that broadcast technology has changed dramatically since 1965 and that many of the specific problems discussed in *Estes* may no longer apply.

Advances in broadcast technology, however, have also created new threats to the integrity of the fact finding process. The traditional public spectator or media representative who attends a federal criminal trial leaves the courtroom with his or her memory of the proceedings and any notes he or she

---

**3.** In *Chandler v. Florida*, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981), the Supreme Court held that the presence of television cameras in the courtroom does not necessarily violate a criminal defendant's right to a fair trial. *Id.* at 581, 101 S.Ct. 802. Although the concerns identified by the Justices in *Estes* about the physical presence of cameras and microphones in the courtroom are no longer of constitutional proportion, they are still of practical concern.

may have taken. These spectators do not leave with a permanent photograph.[4] However, once a witness' testimony has been televised, the witness' face has not just been publicly observed, it has also become eligible for preservation by VCR or DVD recording, digitizing by the new generation of cameras or permanent placement on Internet web sites and chat rooms. Today, it is not so much the small, discrete cameras or microphones in the courtroom that are likely to intimidate witnesses, rather, it is the witness' knowledge that his or her face or voice may be forever publicly known and available to anyone in the world.

As the United States argues, this intimidation could lead foreign prosecution witnesses, outside the jurisdiction of the Court, to refuse to testify or withhold their full testimony out of reasonable fears for their personal safety. It could similarly lead witnesses favorable to the defense to refrain from coming forward for fear of being ostracized. The permanent preservation of images of law enforcement witnesses could also jeopardize their future careers or personal safety. How could an agent whose face was known throughout the world ever be able to work undercover or interview witnesses on the street effectively?

Knowledge that the proceedings were being broadcast may also intimidate jurors. Excluding cameras and other recording devices from the courtroom will help preserve the anonymity of the jurors who are selected to serve and minimize the potential for a "popular verdict." *See Estes*, 381 U.S. at 592, 85 S.Ct. 1628 (Harlan, J., concurring).

The intervenors, obviously sensitive to these concerns, argue that they would agree to mask the faces of all jurors or witnesses who did not wish to be photographed. That response is insufficient for two reasons. First, it creates an additional management issue for the Court in what is an already complex case. As a practical matter, names of trial witnesses in criminal cases are not usually exchanged in advance. Therefore, witness requests not to be photographed

would likely have to be addressed just as the witness is called to testify, and directions would have to be given to camera operators not to photograph those witnesses. How much time that colloquy might take and the impact on the witness is hard to determine, but it would certainly add to any nervousness that person might have about testifying and could delay the trial while the camera was being adjusted. Second, mistakes can be made. If a witness' or juror's face were inadvertently televised, the harm cannot be undone. Given that this case involves allegations that members of the al Qaeda conspiracy, a world wide terrorist organization with cells operating within this country, monitor trial proceedings involving its members, any mistake could expose the juror or witness to serious risks to their personal safety.

Even if every witness' face were obscured, the faces of the attorneys, court staff, and security officers would be exposed, subjecting them to the possibility of long-term security problems. In addition, publicly broadcast photographic images of the set up of the courtroom, the location of the cell block, the number of deputy marshals, where the deputies stand in the courtroom, placement of doors and other courtroom details could jeopardize the security of these proceedings. Intervenors have offered no solutions to these problems.

The United States also argues that any retrial of this already highly publicized case would be rendered extremely difficult if the trial proceedings have been broadcast. A potential juror who had watched portions of the first trial could be tainted. If witnesses experienced any recrimination from members of the public for testifying in the first trial, those witnesses may be unwilling or hesitant to testify at a retrial.

Lastly, world wide broadcasting of these proceedings, either by television, radio or the Internet, would be an open invitation to any trial participant to engage in showmanship or make a public spectacle for the world to see or hear.[5] This possibility is of particular

---

4. The drawings produced by sketch artists are not so true as to make it easy to identify the

people depicted if they were seen walking down the street.

5. Even in the absence of Rule 53, our concerns

concern because, at his arraignment, the defendant insisted on personally advising the Court that he would not respond to the charges against him by entering, as is the normal practice, a plea of guilty or not guilty. This behavior suggests that the defendant's conduct in this case may be both unorthodox and unpredictable.

We are very aware of the extensive, legitimate public interest in this case, and understand that many thousands of people in this country and throughout the world, suffered devastating losses on September 11, 2001. It is understandable that they might want to watch this trial. However, contrary to what intervenors have argued, the purpose of this trial is not to provide catharsis to the victims or to educate the world about the American legal system. Instead, the purpose is to determine the innocence or guilt of this defendant for the specific crimes charged in the Indictment. It remains a bedrock principle of our legal system that the courts have the right "to conduct their business in an untrammeled way." *Wood v. Georgia*, 370 U.S. 375, 383, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). To ensure that both this defendant and the United States receive a fair and orderly trial, none of these proceedings should be photographed or broadcast in any form.

We find that all of these concerns provide compelling reasons for prohibiting any photographing or broadcasting of either the pretrial or trial proceedings. Accordingly, the intervenors' Motion to Record and Telecast will be denied by an Order issued with this Memorandum Opinion.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record for the parties, counsel for intervenors, counsel for amici, and Department of Justice Security Specialist, Christine Gunning.

about security of trial participants and the integrity of the fact finding process remain, but to a lesser degree, if an audio broadcast of the trial were available over the radio or Internet.