Voto de conformidad emitido por el
Juez Asociado Señor Kolthoff Caraballo.
Hoy —aunque en etapa experimental— este Tribunal da otro paso de avance hacia un sistema de justicia más transparente. A su vez, claro está, la Prensa alcanza otra victoria importante y, con eso, el País fortalece su *777 democracia. Por primera vez en nuestra jurisdicción se permite a los medios televisivos grabar en el salón de se-siones parte de un proceso criminal.
Por la importancia que estoy convencido comprende este asunto para el mejoramiento de la Rama Judicial, y el im-pacto positivo que percibo que ello representa en la con-fianza de nuestro Pueblo, el 28 de febrero de 2011 me ex-presé por primera vez públicamente en torno a este tema en uno de los periódicos del País.(1) En ese momento señalé que estaba convencido de que una Prensa responsable ayuda a depurar con su presencia todos los componentes del sistema judicial.
Es claro que una Prensa más libre en nuestras salas judiciales es un gran motivador para que tanto jueces, abo-gados de las partes, fiscales, procuradores, en fin, todo pro-fesional del Derecho se esfuerce aún más por cumplir ple-namente con su rol. Eso, además del tremendo beneficio que representa el que, desde la tranquilidad y comodidad de sus hogares, los ciudadanos de nuestro país puedan ob-servar y advertir, de primera mano, lo que ocurre en el escenario judicial.
No obstante, y como suele ocurrir, la llegada de tal pro-greso acarrea sus riesgos. Imbricado por sus grandes beneficios, yace en el equipaje de este particular avance otra realidad que también advierto no podemos de ninguna manera eludir. En 1996, en una comparecencia ante una subcomisión del Comité de Apropiaciones del Congreso de Estados Unidos, el ahora retirado Juez Asociado del Tribunal Supremo de Estados Unidos, David Souter, señaló que el día que una cámara entrara a una vista oral en el Tribunal Supremo federal sería sobre su cadáver.(2)
*778 Sin embargo, lo que más llamó mi atención de las pala-bras del Juez Souter fue la experiencia de vida que este esbozó como motivo para su expresión. Souter señaló que cuando fue juez en el Estado de New Hampshire, la utili-zación de las cámaras había afectado su comportamiento en el estrado. Esto, por su convencimiento de que alguna pregunta que hiciera pudiera ser sacada fuera de contexto en los noticiarios mañaneros del próximo día. La Rama Judicial “no es parte de la industria del entretenimiento”, concluyó el Juez Souter. Estas expresiones deben ser con-sideradas con profunda reflexión.(3) Para mí no existe duda de que el temor del Juez Souter tiene fundamento.

Historia y precedente judicial

Todo esto se ve con mayor claridad si inyectamos una pincelada de historia que nos ayude a entender la razón que motivó, en gran parte, esta aversión a los medios tele-visivos en las salas de justicia. Esta aversión ha ido dismi-nuyendo aceleradamente a través de los años, pero que todavía persiste en varias jurisdicciones.
Todo inició con lo ocurrido durante el juicio criminal contra Bruno Hauptmann, acusado, convicto y ejecutado por lo que se denominó a mediados de la década de los 30 como “el crimen del siglo”: el secuestro y asesinato del hijo de apenas 20 meses del notorio aviador Charles Lindbergh. Durante el juicio, Hauptmann se sentó en la silla de los testigos en una sala repleta de periodistas de diversos me-dios de comunicación y su testimonio fue grabado por las cámaras presentes. El problema sobrevino, en parte, por el gran “circo mediático” que se desarrolló cuando la graba-ción del testimonio del acusado Hauptmann fue presen-tada en distintos cines a través de toda la nación estado-unidense, aun en contra de las órdenes del Tribunal. *779 Además, la conmoción que provocó el juicio produjo que más de 200 reporteros atestaran constantemente el salón, muchos con sus cámaras de filmación y fotografía, gra-bando y tomando fotos con sus “flashes”. Finalizado el pro-ceso, Hauptmann apeló su convicción señalando, entre otros errores, la distracción desmedida que se produjo a causa de toda la cobertura mediática. No obstante, el Tribunal Supremo federal denegó la petición de certiorari.(4)
Ahora bien, como consecuencia de lo ocurrido en el juicio contra Hauptmann, en 1937 la American Bar Association aprobó en su modelo de Código de Conducta Judicial el notorio Canon 35, que prohibía el uso de cámaras de todo tipo en los juicios. Eso motivó que prácticamente todos los estados —con la excepción de dos— adoptaran ese canon.
Con el surgimiento, a mediados de los años 50, de la industria televisiva en Estados Unidos, volvió a diluci-darse la controversia en torno a si la presencia de las cá-maras de televisión durante un proceso judicial podían ser perjudiciales al derecho constitucional a un juicio justo e imparcial que cobija a todo acusado. En 1965, en Estes v. Texas, 381 US 532 (1965), el Tribunal Supremo federal pa-reció contestar tal interrogante en la afirmativa, al revocar la convicción por estafa (swindling) del empresario Billie Sol Estes. El juicio criminal contra el señor Estes —quien era amigo personal del entonces presidente Lyndon B. Johnson— fue transmitido (en parte en vivo y en parte dife-rido) por radio y televisión, con múltiples restricciones en varias instancias.
Como se reseña detalladamente en la opinión de la Corte Suprema federal en Estes, durante el juicio la sala estuvo todo el tiempo atestada de periodistas, con al menos 12 camarógrafos, cantidad de cables por todo el suelo, y múltiples micrófonos sobre el estrado del juez, frente al estrado del Jurado, de los abogados del Ministerio Público *780 y de la defensa. Los camarógrafos intentaron, incluso, ha-cer tomas de los documentos que el acusado tenía ante sí mientras estaba sentado en la mesa de la Defensa junto a sus abogados. Todo esto provocó un trastorno considerable al proceso judicial.
Además, durante los dos días que duró el juicio, los me-dios de comunicación comentaron extensamente sobre este, reprodujeron los segmentos grabados por las cámaras e hicieron una selección del material que ellos entendían que servía mejor a sus fines periodísticos. Ante todo esto, el Tribunal Supremo federal finalmente revocó la convicción del señor Estes al señalar, entre otros fundamentos, que el intenso clamor público resultante de la cobertura de radio y televisión durante el proceso judicial constituyó una vio-lación al derecho a un juicio justo e imparcial. En su opi-nión, la Corte Suprema federal llegó, incluso, a señalar que "los juicios televisados [eran], por lo tanto, ajenos a nuestro sistema”.(5)

El importante caso “Chandler v. Florida”

Sin embargo, en 1981 el Tribunal Supremo federal cambió su posición en torno a este asunto.(6) En Chandler v. Florida, 449 US 560 (1981), el Alto Foro judicial atendió nuevamente el tema al enfrentarse a la controversia sobre “si, consistente con las garantías constitucionales, un Estado podía proveer cobertura radial, televisiva y fotográ-fica de un juicio criminal para difusión pública, aún con la objeción del acusado”.
Chandler v. Florida, supra, fue un caso que atrajo la atención de los medios de comunicación por tratarse de dos policías del condado de Miami Beach acusados de conspi- *781 ración y robo. Además, el testigo principal del Ministerio Público era un joven radioaficionado que escuchó por ca-sualidad una conversación que los acusados sostuvieron por el sistema de radio (walkie-talkie) de la Policía. Du-rante el juicio, una cámara de televisión transmitió en su totalidad el testimonio del radioaficionado; no se transmi-tió ninguna de la prueba de la defensa y finalmente sí se transmitieron los argumentos finales de las partes.
En Chandler, el Tribunal Supremo federal, por voz del entonces Juez Presidente Warren E. Burger, definitiva-mente dejó atrás la idea de que los juicios televisados son ajenos a nuestro sistema. El Tribunal aclaró que Estes v. Texas, supra, no estableció una regla constitucional dirigida a que toda cobertura fotográfica, radial o televisiva de juicios criminales constituye una negación inherente del debido proceso de ley. Estes no pretendió ser una prohibición absoluta a que los estados pudieran experimentar con una tecnología en desarrollo que, en términos de forma de comunicación masiva, se encontraba relativamente en pañales en 1964 cuando Estes fue resuelto y que, aún ahora, se encuentra en un estado de continuo cambio.
Luego de aclarar el alcance de Estes v. Texas, supra, la Corte Suprema federal determinó que los peticionarios en Chandler no habían probado con exactitud que la presencia de las cámaras durante el juicio afectara la capacidad del jurado para decidir el caso considerando únicamente la evidencia ante sí o que el juicio se afectara por el impacto —en cualquiera de los participantes del proceso— de la presencia de las cámaras y la exposición a la transmisión.(7)
No existen dudas en términos de que Chandler v. Florida, supra, constituye una luz verde a los estados para experimentar con la posibilidad de transmisiones radiales y televisivas, aún en procesos criminales. Evidentemente, corresponde a los estados y a Puerto Rico el que, según *782 nuestras expectativas, establezcamos los mecanismos ne-cesarios para conseguir en nuestros procesos judiciales la mejor cobertura posible de los medios, salvaguardando los derechos de la partes y, muy en especial, de los acusados.

Conclusión

Como señalé, este proyecto experimental está aún en ciernes. No obstante, mi visión es cada vez más clara y mi posición, como parte de esta Curia, es más firme. Con la excepción de los asuntos que se dilucidan en las salas de familia y menores, estableciendo las restricciones que se en-tiendan necesarias, evaluando caso a caso y, sobre todo, concediendo una total discreción a los jueces de instancia,(8) creo que es posible transmitir, incluso de forma tele-visiva, cualquier proceso judicial, en cualquier etapa.
Como hemos visto, el aspecto más crítico de esta odisea es lo concerniente a los procesos en las salas criminales. Los derechos de los acusados a un juicio justo e imparcial como parte del debido proceso de ley constitucional, y la seguridad de los testigos, jurados y demás protagonistas del procedimiento judicial criminal, son aspectos de la más alta importancia y preocupación. Sin embargo, estoy con-vencido de que estos son asuntos en los que se pueden ha-cer los ajustes necesarios para asegurar la transmisión del proceso. De todos modos, debemos recordar que “no esta-mos inventando la rueda”.(9)
Sin embargo, y por otro lado, tenemos que aceptar que el temor del Juez Souter en 1996 es más real hoy. Los me-dios de comunicación en el mundo —y Puerto Rico, sin *783 duda, no es la excepción— tienen una influencia extraordi-naria en la opinión pública. Por eso, la Prensa tiene que procurar que cada uno de sus componentes cumpla respon-sablemente con su rol, pues nadie fiscaliza a la Prensa, sino ella misma. Una actitud desdeñada en este aspecto podría con el tiempo, y como ha ocurrido en otras jurisdicciones, provocar que se cierre nuevamente esta puerta.
Con relación a lo que cada medio informativo o de en-tretenimiento terminará haciendo con el material que se transmite desde nuestras salas de justicia, cómo lo edita-rán y con qué propósito, en realidad es un asunto que el Pueblo tendrá que juzgar como el último y real juez supremo. Solo les recuerdo —con quizás fastidiosa insis-tencia— que el temor del Juez Souter tiene hoy más que nunca gran fundamento. Por esto, les reitero lo dispuesto en la resolución mediante la cual aprobamos las enmien-das al Canon 15 de Ética Judicial:
Toda persona deberá actuar responsablemente al difundir información de un proceso judicial, por lo que deberá asegu-rarse que la información que divulgue concuerde fielmente con la realidad de lo ocurrido en el proceso judicial. (Enfasis suplido).(10)
Corresponde a esta Curia, como ocurre con la determi-nación que hoy emite la Mayoría, mantener una actitud de apertura y un paso de avanzada en este asunto. Sé que el reto es grande. Aun así, elijo confiar en que el país sabrá apreciar los beneficios de esta apertura y que los medios de comunicación sabrán corresponder al apoyo que reciben de todos nosotros.
Por todo lo anterior, estoy conforme con la decisión de la Mayoría.

 El Nuevo Día, http:/ /www.elnuevodia.com/columna- transparentes-1200444.html (última visita el 2 de noviembre de 2013).

 The New York Times, www.nytimes.com/1996/03/30/us/on-cameras-in-supreme-court-souter-says-over-my-dead-body.html (última visita el 2 de noviembre de 2013).

 Antes de ser Juez Asociado del Tribunal Supremo federal, el Juez Souter fue juez superior y juez del Tribunal Supremo del estado de New Hampshire. Podríamos estipular su testimonio como pericial.

 Hauptmann v. State of New Jersey, 296 US 649 (1935); certiorari denegado.

 Estes v. Texas, 381 US 532, 549 (1965).

 Lo cierto es que inmediatamente después de Estes v. Texas, supra, el Tribunal Supremo federal había comenzado a dar indicios de cambio en su postura, particularizando las circunstancias de Estes. Véanse: Sheppard v. Maxwell, 384 US 333 (1966); Murphy v. Florida, 421 US 794 (1975); Nebraska Press Assn. v. Stuart, 427 US 539 (1976).

 Chandler v. Florida, 449 US 560, 581 (1981).

 Es menester reseñar el hecho de que, como establece la Regla 7(c) del Regla-mento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales, la determinación de un tribunal de instancia de permitir o no la transmisión de un proceso judicial no es revisable, excepto que el propio tribunal reconsidere su posición.

 Actualmente, más de 37 estados permiten una cobertura total de sus proce-sos judiciales, incluyendo los juicios criminales.

 In re C. 15; Regl. Uso Cámaras Proc. Jud., 188 DPR 424, 427 (2013).