Justice Breyer,
with whom Justice Stevens, Justice Ginsburg, and Justice Sotomayor join, dissenting.
The Court today issues an order that will prevent the transmission of proceedings in a nonjury civil case of great public interest to five other federal courthouses located in Seattle, Pasadena, Portland, San Francisco, and Brooklyn. The Court agrees that it can issue this extraordinary legal relief only if (1) there is a fair chance the District Court was wrong about the underlying legal question, (2) that legal question meets this Court’s certiorari standards, (3) refusal of the relief would work “irreparable harm,” (4) the balance of the equities (including, the Court should say, possible harm to the public interest) favors issuance, (5) the party’s right to the relief is “clear and undisputable,” and (6) the “question is of public importance” (or otherwise “peculiarly appropriate” for such action). See ante, at 190; Rostker v. Goldberg, 448 U. S. 1306, 1308 (1980) (Brennan, J, in chambers) (stay standard); Cheney v. United States Dist. Court for D. C., 542 U. S. 367, 380 (2004) (noting that mandamus is a “drastic and extraordinary remedy reserved for really extraordinary causes” (internal quotation marks omitted)). *200 This case, in my Anew, does not satisfy a single one of these standards, let alone all of them. Consequently, I must dissent.
First, consider the merits of the legal issue: The United States Code, in a chapter entitled “Rules of Courts,” states that “[a]ny rule . . . shall be prescribed only after giving appropriate public notice and an opportunity for comment.” 28 U. S. C. § 2071(b). The question here is whether the District Court accompanied the modification of its antivideo rule with “appropriate public notice and an opportunity for comment.”
Certainly the parties themselves had more than adequate notice and opportunity to comment before the Rule was changed. On September 25, 2009, the trial judge, Chief Judge Vaughn Walker, discussed the possibility of broadcasting trial proceedings both Avithin the courthouse and beyond, and asked for the parties’ views. No party objected to the presence of cameras in the courtroom for transmissions Avithin the courthouse, Exh. 9, p. 70, App. to Pet. for Mandamus in No. 10-70063 (CA9) (hereinafter App. to Pet.) (“No objection. None at all”), and both sides made Avritten submissions to the court regarding their views on other transmissions. The court again raised the issue at a hearing on December 16.
Nor, in practice, did other members of the Judiciary lack information about the issue. In May 1996 the Circuit Council adopted a policy permitting video in connection with appellate proceedings, but prohibiting its use in the district court. Subsequently, appellate court panels have frequently permitted electronic coverage. Judges, the press, lawyers, and others have discussed the matter. In 2007 the lawyers and judges present at the Ninth Circuit Judicial Conference considered a resolution that favored the use of cameras in district court civil nonjury proceedings. And, voting separately, both laAvyers and judges “approved the resolution by resounding margins.” Letter from Chief Judge Kozinski to *201 Judge Anthony Scirica (Jan. 10, 2010), Exh. 8, p. 4, Supp. App. to Response for Perry et al. (hereinafter Supp. App. to Response). Subsequently, a committee of judges was created to study the matter. And on December 17, 2009, the Circuit Council voted to authorize a pilot program permitting the use of video in nonjury civil cases as part of an “experiment with the dissemination of video recordings in civil non-jury matters” (specifically those selected by the Chief Judge of the Circuit and the Chief Judge of the District Court). And it issued a press release. News Release, Ninth Circuit Judicial Council Approves Experimental Use of Cameras in District Courts (Dec. 17, 2009), Exh. 13, App. to Pet.
In this context the United States District Court for the Northern District of California amended its local rules on December 22, 2009, to bring them into conformity with Ninth Circuit policy. In particular, the court amended the local Rule forbidding the public broadcasting or televising of court proceedings by creating an exception “for participation in a pilot or other project authorized by the Judicial Council of the Ninth Circuit.” Public Notice Concerning Revisions of Civil Local Rule 77-3, id., Exh. 14. The court initially relied on a provision in the United States Code that permits district courts to prescribe rules “without public notice and opportunity for comment” “[i]f the prescribing court determines that there is an immediate need for a rule,” and if the court “promptly thereafter afford[s] such notice and opportunity for comment,” 28 U. S. C. § 2071(e). See Exh. 1, at 11, Supp. App. to Response. Then, on December 31, the court revised its public notice to ask for comments directly. By January 8, 2010, the court had received 138,542 comments, all but 32 of which favored transmitting the proceedings. Id., at 12.
Viewed in light of this history, the court satisfied the statute’s insistence that “notice” be “appropriate.” Of. 28 U. S. C. §§ 2071(b), (e). The parties, the judges, and the in *202 terested public were aware of the proposals to change Ninth Circuit policy that culminated in the “pilot program” well before the change in the local rules that enabled participation in the project. The Ninth Circuit issued a press release in mid-December explaining its new “pilot program.” Then, once the District Court amended its local rule, it issued its own notice nearly three weeks before the transmissions that the rule change authorized were to begin. And the rule change itself is simply a change that conforms local rule to Circuit policy — a conformity that the law may well require. (The Judicial Council had long before voted to make its video policy “binding on all courts within the Ninth Circuit,” Letter from Chief Judge Hug to All Ninth Circuit Judges (June 21, 1996) (available in Clerk of Court’s case file); it announced its new “pilot program” policy in December 2009, . App. to Application, Exh. 13, App. to Pet.; and federal statutes render district court rules void insofar as they have been “modified or abrogated” by the Council, see § 2071(c)(1).) Compare ante, at 195 (“Council only has the power to modify or abrogate local rules that conflict with federal law”), with 28 U. S. C. § 332(d)(1) (“[C]ouncil shall make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit”). The applicants point to no interested person unaware of the change. How can the majority reasonably demand yet more notice in respect to a local rule modification that a statute likely requires regardless?
There was also sufficient “opportunity for comment.” The parties, the intervenors, other judges, the public — all had an opportunity to comment. The parties were specifically invited by Chief Judge Walker to comment on the possibility of broadcast as early as September. And the entire public was invited by the District Court to submit comments after the rule change was announced, right up to the eve of trial. As I said, the court received 138,542 comments during that time. How much more “opportunity for comment” does *203 the Court believe necessary, particularly when the statutes themselves authorize the local court to put a new rule into effect “without” receiving any “comments” before doing so when that local “court determines that there is an immediate need” to do so (and to receive comments later)? And more importantly, what is the legal source of the Court’s demand for additional comment time in respect to a rule change to conform to Judicial Council policy?
Second, this legal question is not the kind of legal question that this Court would normally grant certiorari to consider. There is no conflict among the state or federal courts regarding the procedures by which a district court changes its local rules. Cf. this Court’s Rules 10(a)-(b). The technical validity of the procedures followed below does not implicate an open “important question of federal law.” Cf. Rule 10(c). Nor do the procedures below clearly conflict with any precedent from this Court. Cf ibid.
It is particularly inadvisable for this Court to consider this kind of question because it involves local rules and local judicial administration. Here, for example, the Court decides just how a district court should modify its own local rules; in a word, this Court micromanages district court administrative procedures in the most detailed way. And, without briefing, the Court imposes limitations on the judicial councils’ ability to implement policy decisions, ante, at 194-195 (suggesting council policy does not abrogate local rules), with consequences we cannot predict. The district councils, the circuit councils, the Judicial Conference of the United States, and The Chief Justice bear responsibility for judicial administration, not this Court. See 28 U. S. C. §§ 331-332. And those bodies have adequate authority to resolve disagreements about how to promulgate and apply local rules, and, particularly, about the use of cameras in the courtroom.
For the past 80 years, local judicial administration has been left to the exclusive province of the circuit judicial councils, and this Court lacks their institutional experience. See *204 generally P. Fish, The Politics of Federal Judicial Administration 152-153 (1973) (From their creation, “[t]he councils constituted ... a mechanism through which there could be a concentration of responsibility in the various Circuits — immediate responsibility for the work of the courts in the Circuits, with power and authority ... to insure competence in th[eir] work ...” (internal quotation marks omitted)). For that reason it is inappropriate as well as unnecessary for this Court to intervene in the procedural aspects of local judicial administration. Perhaps that is why I have not been able to find any other case in which this Court has previously done so, through emergency relief or otherwise. Cf. Bank of Nova Scotia v. United States, 487 U. S. 250, 264 (1988) (Scalia, J., concurring) (“I do not see the basis for any direct authority to supervise lower courts” (citing Frazier v. Heebe, 482 U. S. 641, 651-652 (1987) (Rehnquist, C. J., dissenting))). Nor am I aware of any instance in which this Court has preemptively sought to micromanage district court proceedings as it does today.
I recognize that the Court may see this matter not as one of promulgating and applying a local rule but, rather, as presenting the larger question of the place of cameras in the courtroom. But the wisdom of a camera policy is primarily a matter for the proper administrative bodies to determine. See 28 U. S. C. § 332. This Court has no legal authority to address that larger policy question except insofar as it implicates a question of law. The relevant question of law here concerns the procedure for amending local rules. And the only relevant legal principles that allow us here to take account of the immediate subject matter of that local rule, namely, cameras, are those legal principles that permit us— indeed require us — to look to the nature of the harm at issue and to balance equities, including the public interest. I consequently turn to those two matters.
Third, consider the harm: I can find no basis for the Court’s conclusion that, were the transmissions to other *205 courtrooms to take place, the applicants would suffer irreparable harm. Certainly there is no evidence that such harm could arise in this nonjury civil case from the simple fact of transmission itself. By my count, 42 States and two Federal District Courts currently give judges the discretion to broadcast civil nonjury trials. See Media Privacy and Related Law 2009-10 (2009) (collecting state statutes and rules); Civ. Rule 1.8 (SDNY 2009); Civ. Rule 1.8 (EDNY 2009). Neither the applicants nor anyone else “has been able to present empirical data sufficient to establish that the mere presence of the broadcast media inherently has an adverse effect on [the judicial] process,” Chandler v. Florida, 449 U. S. 560, 578-579 (1981). Cf. M. Cohn & D. Dow, Cameras in the Courtroom: Television and the Pursuit of Justice 62-64 (1998) (canvassing studies, none of which found harm, and one of which found that witnesses “who faced an obvious camera, provided answers that were more correct, lengthier and more detailed”). And, in any event, any harm to the parties, including the applicants, is reparable through appeal. Cf. Chandler, supra, at 581.
The applicants also claim that the transmission will irreparably harm the witnesses themselves, presumably by increasing the public’s awareness of who those witnesses are. And they claim that some members of the public might harass those witnesses. But the witnesses, although capable of doing so, have not asked this Court to set aside the District Court’s order. Cf. Miller v. Albright, 528 U. S. 420, 445 (1998) (O’Connor, J., joined by Kennedy, J., concurring in judgment); Powers v. Ohio, 499 U. S. 400, 411 (1991). And that is not surprising. All of the witnesses supporting the applicants are already publicly identified with their cause. They are all experts or advocates who have either already appeared on television or Internet broadcasts, already toured the State advocating a “yes” vote on Proposition 8, or already engaged in extensive public commentary far more *206 likely to make them well known than a closed-circuit broadcast to another federal courthouse.
The likelihood of any “irreparable” harm is further diminished by the fact that the court order before us would simply increase the trial’s viewing audience from the occupants of one courtroom in one courthouse to the occupants of five other courtrooms in five other courthouses (in all of which taking pictures or retransmissions have been forbidden). By way of comparison literally hundreds of national and international newspapers are already covering this trial and reporting in detail the names and testimony of all of the witnesses. See, e. g., Leff, Woman Recalls Emotional Ordeal of Gay Marriage Ban, Associated Press, Jan. 11, 2010. I see no reason why the incremental increase in exposure caused by transmitting these proceedings to five additional courtrooms would create any further risk of harm, as the Court apparently believes. See ante, at 195-196. Moreover, if in respect to any particular witness this transmission threatens harm, the District Court can prevent that harm. Chief Judge Walker has already said that he would keep the broadcast “completely under the Court’s control, to permit the Court to stop it if [it] proves to be a problem, if it proves to be a distraction, [or] if it proves to create problems with witnesses.” See Exh. 2, at 45, App. to Pet. The Circuit Council confirmed in a press release that the District Court “willfully control the process” and that “Judge Walker has reserved the right to terminate any part of the audio, or video, or both, for any duration” or to terminate participation in the pilot program “at any time.” News Release, Federal Courthouses To Offer Remote Viewing of Proposition 8 Trial (Jan. 8, 2010), http://www.ca9.uscourts.gov/datastore/ gener al/2010/01/08/Pr op8_Remote_Viewing_L ocati ons .pdf (as visited Jan. 18, 2010, and available in Clerk of Court’s case file). Surely such firm control, exercised by an able District Court Judge with 20 years of trial-management ex *207 perience, will be sufficient to address any possible harm, either to the witnesses or to the integrity of the trial.
Fourth, no fair balancing of the equities (including harm to the public interest) could support issuance of the stay. See Times-Picayune Publishing Corp. v. Schulingkamp, 419 U. S. 1301, 1305 (1974) (Powell, J., in chambers) (recognizing “significant public and private interests balanced on both sides” when “presented with] a fundamental confrontation between the competing values of free press and fair trial”). As I have just explained, the applicants’ equities consist of potential harm to witnesses — harm that is either nonexistent or that can be cured through protective measures by the District Court as the circumstances warrant. The competing equities consist of not only the respondents’ interest in obtaining the eourthouse-to-eourthouse transmission that they desire, but also the public’s interest in observing trial proceedings to learn about this case and about how courts work. See Nebraska Press Assn. v. Stuart, 427 U. S. 539, 587 (1976) (Brennan, J., concurring in judgment); see also Exh. 2, at 42, App. to Pet. (statement of Chief Judge Walker) (“[I]f the public could see how the judicial process works, they would take a somewhat different view of it.” “I think the only time that you’re going to draw sufficient interest in the legal process is when you have an issue such as the issues here, that people think about, talk about, debate about and consider”). With these considerations in the balance, the scales tip heavily against, not in favor of, issuing the stay.
The majority’s action today is unusual. It grants a stay in order to consider a mandamus petition, with a view to intervening in a matter of local court administration that it would not (and should not) consider. It cites no precedent for doing so. It identifies no real harm, let alone “irreparable harm,” to justify its issuance of this stay. And the public interest weighs in favor of providing aeeess to the courts. To justify this extraordinary intervention, the majority in *208 sists that courts must “enforce the requirement of procedural regularity on others, and must follow those requirements themselves.” Ante, at 184. And so too should this Court adhere to its institutional competence, its historical practice, and its governing precedent — all of which counsel strongly against the issuance of this stay.
I respectfully dissent.